## THE NORTHERN CENTRAL RY. CO. *vs.* THE STATE, Use of ALEXANDER GILMORE.

*Collision at Railway Crossing—Safety Gates Open—Effect of Testimony That no Bell Was Rung—Sufficiency of Evidence of Negligence— Instructions to the Jury.*

The fact that the safety gates at a railway crossing are not closed when a train is approaching is evidence of negligence to go to the jury.

But the existence of safety gates at a crossing, with a watchman in charge of them, does not relieve a person about to cross the tracks from the duty of looking and listening for approaching trains. And if he is struck by a train which he could have seen or heard in time to avoid injury if he had looked and listened, he is guilty of contributory negligence, preventing a recovery of damages, although he went upon the tracks because the safety gates were open when they should have been closed.

When three eye witnesses of a collision at a railway crossing testify that no bell was rung by the engine as it approached, a prayer is erroneous which charges the jury that the testimony of witnesses that they did not hear the bell is not evidence that it was not rung and must be entirely disregarded.

But the jury in such case may properly be instructed that the testimony of witnesses that they did not hear the bell ring as the engine approached is not of as great probative value as is the affirmative evidence that it was rung.

Plaintiff's son was struck and killed by an engine at a street crossing. In an action to recover damages therefor, plaintiff's evidence was that the deceased, driving a cart loaded with coal came to an intersecting street upon which were four railway tracks of the defendant with safety-gates on each side, and finding the safety-gates down, stopped. A row of box cars stood on the nearest track to his right, interfering with the view in that direction. In a few minutes the gateman, who was on the other side of the tracks, raised the gates and beckoned to the deceased to cross over. Deceased jumped down from the cart, took his horse by the head on the left side and started over. When on the second track the cart was struck by an engine coming from the right and the fatal injury inflicted. Plaintiff's witnesses testified that the deceased could not, from his position at his horse's head, see the engine approaching in time to avert the accident, and that no signal of its approach was given by bell or whistle. Defendant's evidence was that, as deceased started to cross over and before he reached the second

track the gates were lowered and bells rung; that he then had a view of the approaching engine and that the gateman called to him to stop before he reached the second track. *Held*, that the evidence of defendant's negligence was sufficient to take the case to the jury and that there was no such uncontradicted evidence of contributory negligence on the part of the deceased as to preclude recovery as matter of law.

*Held*, further, that the jury were properly instructed to find a verdict for the defendant, if, while the deceased was in a place of safety, the gateman warned him not to attempt to cross and that he in disregard of such warning kept on and was injured in doing so; or if he stopped his cart on the track for the purpose of rearranging the harness and this was the cause of the injury.

Appeal from the Court of Common Pleas (STOCKBRIDGE, J.), where there was a judgment for the plaintiff for $1,500.

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*John J. Donaldson* and *Shirley Carter*, for the appellant.

The alleged acts of negligence on the part of defendant were, (*a*) the failure of the engineer to give signals of its approach; (*b*) the invitation of the gateman.

One witness for plaintiff testified that the engine gave no signal by bell or whistle, and others testified that they did not "hear" or "notice" any, and accordingly, their testimony will be considered in connection with defendant's ninth prayer.

There was testimony for plaintiff that as deceased reached the crossing the gateman beckoned for him to come on.

To prove that either of these negligent acts or omissions was the *cause* of the injury was part of the plaintiff's burden. In other words, to show by the testimony that without such act or omission of defendant the accident would not have occurred. The plaintiff has not met this burden.

The only effect of ringing of bell or of whistle, if given, is as a warning of the engine's approach, addressed to the sense of hearing. If the deceased had other warnings addressed to his senses of sight or hearing, *or both*, then not only is there no proof that the omission of bell or whistle was the *cause* of the accident, but on the contrary proof positive that it was not.

That there was such other warnings there is the clearest proof *absolutely uncontradicted.* It was proved without contradiction that even with box cars standing south of the crossing on the westernmost track, any one on track could see some 300 feet southward down the track, and by simply leaning a little forward a mile or more, and, in the seven foot five inch space between that and the track on which the engine came, all the way to Canton.

Here then is a direct warning addressed to the *sight* of deceased. Even were he alive, he would not be heard to say that, as a matter of fact, he did not see. *Traction Co.* v. *Helms,* 84 Md. 515; *N. C. R. Co.* v. *Medairy,* 86 Md. 174; *State, use of Price* v. *C. & P. R. Co.,* 87 Md. 186; *Reidel* v. *P. W. & B. R. Co.,* 87 Md. 153; *McNab* v. *Railway Co.,* 94 Md. 719.

(2) It is further proved *without contradiction* that, as deceased started across, the gateman lowered the easternmost gates, the bells attached to them ringing as the gates came down. Here then were warnings addressed to both senses, *sight* and *hearing.* That they were seen and heard is a conclusive presumption. *Traction Co.* v. *Helms,* 84 Md. 515; *N. C. R. Co.* v. *Medairy,* 86 Md. 174.

All that has just been said applies with equal force to the supposed "invitation" of the gateman. The construction put by deceased upon the gesture or the call of the gateman we cannot learn, but we do learn, and *without contradiction,* that there were signs of the danger that he could not misconstrue or misread: the sight of the approaching train, the lowering gates and their ringing bells. Such being the case, it is urged that the testimony gives no room for a legitimate inference that a supposed "invitation" of the gateman was the cause of the accident.

The duty of the defendant is unmistakable, viz. : to give timely warning of its train's approach. The form of this warning the law does not dictate, only that it shall be intelligible and timely. That there was such a warning we have already seen, viz.: the lowering of the eastern gates and the ringing of their automatic bells, and that this stands *entirely uncontradicted.*

The duty of the deceased, however, is equally clear, to note and heed such warnings as are given to his senses, whether given by the defendant as warnings or coming naturally from his situation and the surrounding circumstances. The tracks themselves were a warning of danger and required him to be on the alert for such warnings as might be given or might come to him. *Md. Cent. R. R. Co.* v. *Neuber*, 62 Md. 391, 399.

These warnings to deceased, as we have seen by the *uncontradicted* evidence were, (1) the unimpeded vision far up the track in the direction the engine was coming; (2) the lowering of the eastern gates before his very eyes, and (3) the ringing of their automatic bells.

That deceased, while still in a place of safety, could have seen and heard these warnings is equally without contradiction. It is accordingly a conclusive presumption that he did see and hear them. Cases *supra.* That he did not *heed* the warnings is evident from the fact of his keeping on, and this, his own act, was therefore not merely contributory to the accident but the actual *cause* of it. That this act was negligent, of course, needs no argument.

It is submitted that the defendant's fifth prayer should have been granted as offered. In *B. & O. R. R. Co.* v. *Stumpf*, 97 Md. 78, where the plaintiff testified that on coming to a crossing where there were gates and a watchman, the view being obstructed by cars standing on the track, seing the gates up he did not *stop*, but did *look* and *listen*, this Court held that his failure to *stop* as well was not contributory negligence.

This Court, however, did not hold, and it is submitted never would, that the presence of gates and a gateman, or anything done or omitted by him, would entitle the traveller to "close all the avenues of sense" and approach a railroad crossing deaf and blind. And great stress was laid on the ordinance requiring the gates to be closed in that case.

It is submitted that defendant's ninth prayer as offered should have been granted in that form, and not as modified by the Court.

In *B. & O. R. R. Co.* v. *Roming*, 96 Md. 67, the only evidence of negligence of the company was that of witnesses who testified that they did not "hear" or did not "notice" the bell or whistle, and this Court held that this was not sufficient to go to the jury and reversed the judgment for plaintiff without awarding a new trial.

In the case at bar, one witness for plaintiff testified that the engine *did not* blow a whistle or ring a bell. The others of them who spoke of it testified that they did not "hear" or did not "notice"." On the other hand, all of defendant's train crew, including the fireman, who was ringing it, and the gateman, swore positively that the bell was ringing. In the face of this, it will not do, to argue that, inasmuch as one witness of plaintiff testified positively the bell did *not* ring, therefore the defendant was not damnified by the refusal of the prayer as offered.

The plaintiff's one witness, Ruth, was overwhelmingly contradicted on this point by numbers of defendant's witnesses, and those in a position to best know the fact. The Court's modification of this prayer allowed the jury to consider, as they doubtless did, as a corroboration of the direct testimony of this contradicted witness the testimony of witnesses who could only testify that they "did not hear" or "did not notice." And such fancied corroboration may have ruled the verdict.

*William Colton* (with whom was *W. H. Lawrence* on the brief), for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Court of Common Pleas of Baltimore City in favor of the equitable appellee for damages for the death of his son as the result of an accident at a railway crossing. There is but one bill of exceptions in the record and that is from the Court's rulings on the prayers.

The evidence as to the *locus in quo* of the accident and of the situation of the parties involved in it, down to a few minutes before its occurrence, is uncontradicted, but as to the cir-

cumstances of the accident itself there is the most positive
conflict of testimony.   The accident occurred at the intersec-
tion of Eastern avenue, which runs east and and west, and the
tracks of the appellant, which run north and south, in the bed
of Ninth street.    At that point Eastern avenue is seventy feet
wide and Ninth street, on which the railroad tracks run, is one
hundred feet wide.    There are two main tracks of the railroad
in the middle of Ninth street and  there are two freight tracks
to the west of the main ones, making in all  four tracks occu-
pying about  forty feet in width of  the bed of the street.    On
each side of this  set of  tracks  there is a  pair of  safety gates,
across the bed of  Eastern avenue, which are operated  from a
watch box at the south end of  the  gates  on  the east side of
the tracks.    Anyone standing on the westernmost of the four
tracks at its intersection with Eastern avenue has a clear view
southerly for a mile, if no cars are on that track.   At the time of
the accident a row of box cars standing on that track and ex-
tending north to the line of the south side of  Eastern avenue
greatly shortened the view southerly, but even then by leaning
forward or taking a step or two easterly the full length of the
view would have been restored.

On the day of the accident John Gilmore, aged eighteen
years, the son of the equitable plaintiff was engaged in driving
a one-horse coal cart.    About two o'clock  in  the day while
he was going easterly on Eastern ave. across the railroad tracks
with his cart loaded with a ton of coal, the cart was struck on
the south side by one of the appellants' engines going north and
thrown upon his feet, and such injuries were inflicted upon him
that he died therefrom.    The accounts as to the precise method
of the occurrence of the collision between the engine and the
cart are very conflicting.

Thomas Kenny  testified that he was standing in the door-
way of his residence at the northeast corner of Eastern ave-
nue and Ninth street at the time of the accident and saw it
happen.    He said that Gilmore riding upon his cart and im-
mediately followed by a similar cart, was going east on East-
ern avenue and came to the gates on the west side of the

tracks and found them down.    After a few minutes the gate-man, who was on the east side of the tracks, raised the gates and beckoned for the carts to come over the crossing and that Gilmore thereupon jumped down from his cart, took his horse by the head on the north side and started to cross the tracks. When crossing the second track the cart was struck on the south side by the appellant's engine and pushed over on to the boy's feet.    The witness said that he standing in his door-way, saw the smoke and smoke stack of the engine over the box cars but could not see the engine before it came out from behind the cars, nor in his opinion could the boy who was in-jured see the engine from his position leading his horse.    Wit-ness heard no bell rung nor signal given from the engine as it approached and felt sure that from the position he occupied he could have heard the bell if it had rung.  `He was stand-ing only about twenty feet from the cart when it was halted by the western gate being down.

Henry Dean, the driver of the second cart, corroborated Kenny's testimony as to the facts throughout and said that he heard no bell rung or whistle blown from the engine. Charles Miller who was present at the time of the accident also corroborated Kenny's tesitmony as. to all of the facts of the occurrence except that he does not mention the circum-stance that Gilmore was riding on the cart as he first ap-proached the crossing, nor does he say anything *pro* or *con* in reference to signals from the engine as it approached.

Henry Ruth, a cart driver, testified that he was familiar with the crossing and that he was on the spot at the time of the accident.    That by reason of the condition of the streets at the crossing it was necessary for the driver of a loaded coal cart to get down and take his horse by the head when crossing the tracks.    "That the engine didn't ring any bell or blow any whistle there.    There was nothing at all done, only after the boy was in danger and could not get out of it the gate-keeper tried to make him come back, it had him dead then and he could not get out of the way."    The witness was standing by Mr. Kenny's saloon and saw Kenny standing in the door.

On the other hand James McGinness testified for the defendant that he was an eye witness of the accident. That as Gilmore came down Eastern avenue toward the railroad crossing he was beating the horse and causing it to plunge violently and just as he got to the crossing the trace or something snapped and the horse went out of the harness, the boy got down from the cart and spent about five minutes fixing the harness, in the meatime the witness heard the bell of the east safety-gate ring as that gate came down and that the western gate against the boy (Gilmore) also came down and the gate-keeper was growling at the boy who began to beat his horse again and it gave a lunge and just then the engine came along like a flash and struck the cart.

The engineer, fireman, a conductor and two brakemen all of whom were on the engine testified in substance that it was coming north on the second track at a speed of about five miles an hour with its bell ringing when the first they saw of the horse it jumped right in front of the engine and, although every effort was made to stop the latter, it struck the cart and shoved it six or seven feet before coming to a standstill. The engineer testified that as he approached the crossing he was standing in his proper position on the right hand side of the engine in full sight of the gateman and received no warning or danger signal from him.

The gate-keeper testified that he saw the boy coming down Eastern avenue beating the horse and driving recklessly and that when he first saw the engine it was about 600 feet away and at that time the cart was under the gate on the west side of the tracks with the horse's front feet standing between the two rails of the west track. The witness could not put down the west gates because the cart was under them and he might have prevented its backing out. He put down the east gates and called to Gilmore to back out of there but got no answer or attention from him; Gilmore got off his cart to look at his harness which was out of order. By the time he got the harness fixed the engine which was coming on all the time was within 25 or 30 feet away when the horse made a plunge from

the west track to the one on which the engine was approaching and that was the last moment he saw the horse as the engine got between it and him.    He had seen the horse continuously up to that time.    The bell on the engine was ringing as it came up the track.    The witness, when the boy refused to back off the tracks, called out to him "as long as you have been staying there that long damn it stay another half hour till the engine gets past," but he paid no attention to the call.

The plaintiff offered three prayers all of which were granted. These prayers were such as have repeatedly received the sanction of this Court.    In fact the appellant did not on its brief or in the argument of the case object to the form of these prayers but insisted on its special exception to the first one on the ground that there was no legally sufficient evidence that any negligence on its part had caused the injury complained of.

If the testimony was true of the witnesses who swore that they saw Gilmore wait outside the western gate until the gatekeeper raised the gate and beckoned to him to come acrossthe tracks and that he then took his horse by the head and started to obey the invitation of the gate-keeper and was struck by the engine and injured before he could cross the second track there was evidence from which the jury were entitled to believe that the defendant was guilty of negligence causing the injury.    We have often held it to be the duty under ordinary circumstances of a person about to cross the tracks of a steam railway to look and listen for approaching trains and, if his view be obscured, to stop, look and listen, but here the circumstances testified to by many witnesses were special.    According to these witnesses the boy on nearing the tracks respected the danger signal of the closed gates and stopped his cart until the gates were opened by the man in charge of them who beckoned him to come across.    He then went to his horse's head and started to lead him across but was struck by the engine before he had gotten half way over.    The gateman himself testified that the engine as it approached the crossing was in his sight for 600 feet and until it struck the cart.    He gave no signal to the engineer to stop and, if the plaintiffs

witnesses are to be believed, he invited the boy to cross the tracks.    We cannot say under these circumstances that there was no legally sufficient evidence of negligence on the part of the defendant or its agents causing the injury.    In the *B. & O. R. R.* v. *Stumpf*, 97 Md. 94, in discussing the significance of open safety gates at railroad crossings it was said by this Court :    "In *North Eastern R. W.* v. *Wanless*, 7 English and Irish Appeals 12, Lord Cairns held where it was the duty of the railway to keep the gates closed when any train is approaching, that the fact that they were open "amounted to a statement and notice to the public that the line at that time was safe for crossing, and was evidence of negligence to go to the jury;" and the same was held in *Stapley* v. *London and Brighton Ry. Co.*, L. R., 1 Exch. 21; and in *Lunt* v. *London and Southwestern Ry. Co.*, L. R., 1 Q. B. 277.    In the last case, Lord Blackburn observed :    "It could make no difference whether the gate-keeper expresses that the road is safe, by opening that gate, or by word or gestures."    This is the view held in the following cases in this country.    *Grand Trunk Railway Co.* v. *Ives*, 144 U. S. 408; *Dolan* v. *Del. and Hudson Canal Co.*, 71 N. Y. 288; *Glushing* v. *Sharp*, 96 N. Y. 667; *Palmer* v. *N. Y. Cent. R. R.*, 112 N. Y. 234; *Chicago and Rock Island R. R. Co.* v. *Clough*, 134 Ill. 586; *Rhode* v. *Chicago and North Western R. R.*, 86 Wis. 312; *Evans* v. *Lake Shore and Mich. Sou. R. R.*, 88 Mich. 442; *Wilson* v. *N. Y. and N. H. R. R.*, 29 Atl. Rep. 258, and in many other cases which might be cited.    In *Glushing* v. *Sharp, supra*, the Court said :    "The open gate was a *substantial assurance of safety*, just as significant as if the gateman had beckoned or invited him to come on, and that *an ordinarily prudent man* would not be influenced by it, is against all human experience."

In *Stumpf's case* the injured party testified that he had looked and listened for trains as he approached the open gate and the railroad crossing.    In the present case by granting the defendant's fifth prayer as modified by it the Court instructed the jury.    "That the fact that the defendant had placed safety

gates at the crossing in question and stationed a watchman there in charge of the same, did not relieve the deceased of the duty of looking and listening for approaching trains as he approached and went over the crossing, and if the jury shall believe from the evidence that if the deceased had so looked and listened, he would have seen or heard defendant's engines in time by the exercise of ordinary care to avoid the injury, the plaintiff is not entitled to recover, and the verdict must be for the defendant, even though the jury shall find that the gates were open and the watchman made some motion which deceased may have interpreted as an invitation to continue across." The defendant thus had the benefit of an instruction to the jury that the presence of the gates and watchman did not relieve the deceased of the duty of using his own senses to discover the presence of danger as he approached and crossed the tracks.

The Court further by granting the defendant's sixth, seventh and eighth prayers instructed the jury to find a verdict in its favor if they found from the evidence, either that the deceased by his own want of ordinary care contributed in any degree to the happening of his injury—or if while he was in a place of safety the gateman warned him by voice or gesture not to attempt to cross and that he in disregard of such warning kept on across the track and was injured in doing so—or that he stopped his horse and cart on the tracks for the purpose of mending or rearranging the harness, and that he could have done this in a place of safety by driving or leading his horse forward off the tracks or backing him off of them and that he failed to escape injury because of his so stopping on the track to care for the harness. The Court also by granting the defendant's ninth prayer after having modified it instructed the jury that the testimony of witnesses that they did not hear the bell of the engine ring as it approached the crossing is not entitled to be regarded by the jury as of as great probative value as is the positive affirmative evidence that it was so rung.

The defendant had asked the Court by its rejected ninth prayer to charge the jury that testimony of witnesses that they

did not hear the bell was not evidence that it wàs not rung and must be entirely disregarded by them, and in their brief and argument the defendant's counsel relied upon the *Balto. & Potomac R. R. v. Roming*, 96 Md. 67, as authority for their contention in that respect. That is pushing the doctrine of *Roming's case* further than it was intended by us to go. In that case the *only evidence of any negligence* on the part of the defendant was the testimony of two persons who resided a short distance away from the station that they heard at their residence no whistle or bell from the engine prior to the danger signal which came almost at the same time with the crash of the collision, as over against the distinct and circumstantial evidence of the engineer and fireman and the operator in the block signal tower at the station that the customary signals of the approach of the train were exchanged between the engine by whistling and the tower by moving the block signal and that the bell was rung from the engine as usual. Under all of the circumstances of that case we did not think that the failure of the two persons, who were not immediately at the station where the accident occurred, to hear the signals was sufficient of itself to send the case to the jury. We do not regard the present case as a parallel one to *Roming's case*.

The defendant's first prayer asked the Court to take the case from the jury for want of legally sufficient evidence of any negligence of the defendant or its agents which caused the injury complained of. Its second, third and fourth prayers assert the proposition that by the uncontradicted evidence that the deceased was guilty of contributory negligence and therefore the verdict must be for the defendant.

We do not deem it necessary after what we have already said in reference to the evidence appearing in the record to discuss these four rejected prayers of the defendant at length. In view of the character of the evidence we do not think the Court would have been justified in withholding the case from the jury. The prayers which were granted in sending it to them correctly presented the law of the case. The Court committed no error in rejecting the prayers which it refused

to grant, or in modifying as it did the defendant's fifth and ninth prayers before granting them.

The judgment appealed from must be affirmed.

*Judgment affirmed with costs.*

(Decided January 13th, 1905.)